# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 24, 2017          Decided April 28, 2017

No. 17-5024

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

v.

ANTHEM, INC.,
APPELLANT

CIGNA CORPORATION,
APPELLANT

Consolidated with 17-5028

Appeals from the United States District Court
for the District of Columbia
(No. 1:16-cv-01493)

*Christopher M. Curran* argued the cause for appellant Anthem, Inc. With him on the briefs was *J. Mark Gidley*. *Noah A. Brumfield*, *Matthew S. Leddicotte*, and *George L. Paul* entered appearances.

*Charles F. Rule* was on the brief for appellant Cigna Corporation. *Craig A. Benson* entered an appearance.

*Paul T. Denis* and *Steven G. Bradbury* were on the brief for *amici curiae* Antitrust Economists and Business Professors in support of appellant.

*Scott A. Westrich*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Kristen C. Limarzi*, *James J. Fredricks*, *Mary Helen Wimberly*, and *Daniel E. Haar*, Attorneys, *Rachel O. Davis*, Assistant Attorney General, Office of the Attorney General for the State of Connecticut, and *Paula Lauren Gibson*, Deputy Attorney General, Office of the Attorney General for the State of California. *Loren L. AliKhan*, Deputy Solicitor General, Office of the Attorney General for the District of Columbia, *Sarah O. Allen* and *Tyler T. Henry*, Assistant Attorneys General, Office of the Attorney General for the Commonwealth of Virginia, *Ellen S. Cooper*, Assistant Attorney General, Office of the Attorney General for the State of Maryland, *Victor J. Domen Jr.*, Senior Counsel, *Cynthia E. Kinser*, Deputy Attorney General, and *Erin Merrick*, Assistant Attorney General, Office of the Attorney General for the State of Tennessee, *Jennifer L. Foley*, Assistant Attorney General, Office of the Attorney General for the State of New Hampshire, *Devin Laiho*, Senior Assistant Attorney General, Office of the Attorney General for the State of Colorado, *Layne M. Lindebak*, Assistant Attorney General, Office of the Attorney General for the State of Iowa, *Christina M. Moylan*, Assistant Attorney General, Office of the Attorney General for the State of Maine, *Irina C. Rodriguez*, Assistant Attorney General, Office of the Attorney General for the State of New York, and *Daniel S. Walsh*, Assistant Attorney General, Office of the Attorney General for the State of Georgia, entered appearances.

*David A. Balto* was on the brief for *amici curiae* American Antitrust Institute, et al. in support of plaintiffs-appellees.

3

*Edith M. Kallas*, *Joe R. Whatley*, *Jr.*, and *Henry C. Quillen* were on the brief for *amici curiae* The American Medical Association and The Medical Society of the District of Columbia in support of appellees.

*Douglas C. Ross*, *David A. Maas*, and *Melinda Reid Hatton* were on the brief for *amicus curiae* American Hospital Association in support of appellees.

*Richard P. Rouco* was on the brief for *amici curiae* Professors in support of appellees.

Before: ROGERS, KAVANAUGH and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

Concurring opinion filed by *Circuit Judge* MILLETT.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

ROGERS, *Circuit Judge*: This expedited appeal arises from the government's successful challenge to "the largest proposed merger in the history of the health insurance industry, between two of the four national carriers," Anthem, Inc. and Cigna Corporation. Appellees Br. 1. In July 2015, Anthem, which is licensed to operate under the Blue Cross Blue Shield brand in fourteen states, reached an agreement to merge with Cigna, with which Anthem competes largely in those fourteen states. The U.S. Department of Justice, along with eleven States and the District of Columbia (together, the "government"), filed suit to permanently enjoin the merger on the ground it was likely to substantially lessen competition in at least two markets in violation of Section 7 of the Clayton Act. Following a bench trial, the district court enjoined the merger, rejecting the factual

basis of the centerpiece of Anthem's defense, and focus of its current appeal, that the merger's anticompetitive effects would be outweighed by its efficiencies because the merger would yield a superior Cigna product at Anthem's lower rates. The district court found that Anthem had failed to demonstrate that its plan is achievable and that the merger will benefit consumers as claimed in the market for the sale of medical health insurance to national accounts in the fourteen Anthem states, as well as to large group employers in Richmond, Virginia.

Anthem and Cigna (hereinafter, Anthem) challenge the district court's decision and order permanently enjoining the merger on the principal ground that the court improperly declined to consider the claimed billions of dollars in medical savings. *See* Appellant Br. 10.[1] Specifically, Anthem maintains the district court improperly rejected a consumer welfare standard — what it calls "the benchmark of modern antitrust law," *id.* — and generally abdicated its responsibility to balance likely benefits against any potential harm. According to Anthem, the merger's efficiencies would benefit customers directly by reducing the costs of customer medical claims through lower provider rates, without harm to the providers. The government has not challenged Anthem's reliance on an

---

[1] Cigna has become a reluctant supporter of the merger, stating in its appellate brief that "[i]n accordance with the merger agreement, Cigna has appealed and defers to Anthem." Cigna Br. 3. Indeed, the district court noted the "elephant in the courtroom," for at trial Cigna executives dismissed various of Anthem's claims of savings, cross-examined the merging parties' expert witness, and refused to sign Anthem's proposed findings of fact and conclusions of law. *United States v. Anthem, Inc.*, No. CV 16-1493 (ABJ), 2017 WL 685563, at *4 (D.D.C. Feb. 21, 2017). Anthem suggested this is a "'side issue,' a mere 'rift between CEOs.'" *Id.* That their relationship may have deteriorated has little to do with the anticompetitive effects of the proposed merger.

efficiencies defense *per se*. Rather, it points out that Anthem neither disputes that the merger would be anticompetitive but for the claimed medical cost savings, nor challenges the district court's findings on the relevant market definition, ease of entry, the effect of sophisticated buyers, or innovation. Instead, Anthem's appeal focuses principally on factual disputes concerning the claimed medical cost savings, which the government maintains were not verified, not specific to the merger, and not even real efficiencies.

For the following reasons, we hold that the district court did not abuse its discretion in enjoining the merger based on Anthem's failure to show the kind of extraordinary efficiencies necessary to offset the conceded anticompetitive effect of the merger in the fourteen Anthem states: the loss of Cigna, an innovative competitor in a highly concentrated market. Additionally, we hold that the district court did not abuse its discretion in enjoining the merger based on its separate and independent determination that the merger would have a substantial anticompetitive effect in the Richmond, Virginia large group employer market. Accordingly, we affirm the issuance of the permanent injunction on alternative and independent grounds.

**I.**

Under Section 7 of the Clayton Act, a merger between two companies may not proceed if "in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such [merger] may be substantially to lessen competition." 15 U.S.C. § 18.

A burden-shifting analysis applies to consider the merger's effect on competition. *United States v. Baker Hughes Inc.*, 908 F.2d 981, 982 (D.C. Cir. 1990). First, the plaintiff must

establish a presumption of anticompetitive effect by showing that the "transaction will lead to undue concentration in the market for a particular product in a particular geographic area." *Id.* The most common way to make this showing is through a formula called the Herfindahl-Hirschman Index ("HHI"), which compares a market's concentration before and after the proposed merger. *See id.* at 983 n.3. By squaring the market share percentage of each market participant and adding them together, a market's HHI can range from >0 to 10,000 (*i.e.*, a pure monopoly, or $100^2$). Dept. of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 5.3 & n.9 (Aug. 19, 2010) (the "Guidelines"). Under the Guidelines, a market will be considered highly concentrated if it has an HHI above 2500, and if the merger increases HHI by more than 200 points and results in a highly concentrated market, it "will be presumed to be likely to enhance market power." *Id.* § 5.3. Although, as the Justice Department acknowledges, the court is not bound by, and owes no particular deference to, the Guidelines, this court considers them a helpful tool, in view of the many years of thoughtful analysis they represent, for analyzing proposed mergers. *See Baker Hughes*, 908 F.2d at 985–86.

The burden shifts, once the prima facie case is made, to the defendant to rebut the presumption. *Id.* at 982. To do so, it must provide sufficient evidence that the prima facie case "inaccurately predicts the relevant transaction's probable effect on future competition," or it must sufficiently discredit the evidence underlying the initial presumption. *Id.* at 991. "The more compelling the prima facie case, the more evidence the defendant must present to rebut it successfully," but because the burden of persuasion ultimately lies with the plaintiff, the burden to rebut must not be "unduly onerous." *Id.*

Upon rebuttal by the defendant, "the burden of producing additional evidence of anticompetitive effect shifts to the

[plaintiff], and merges with the ultimate burden of persuasion, which remains with the [plaintiff] at all times." *Id.* at 983.

**II.**

Anthem is the second-largest seller of medical health insurance to large companies in the United States, and it serves approximately 38.6 million medical members. It is a member of the Blue Cross Blue Shield Association, a group of thirty-six health insurance companies licensed to do business under the Blue Cross and/or Blue Shield brands. Anthem holds an exclusive license to the Blue brands in all or part of fourteen states (the "Anthem states"), and it may also compete for business outside those states if it receives permission from the Blue licensee in the relevant area. Anthem also owns non-Blue subsidiaries through which it may operate both in and outside of the Anthem states, subject to Anthem's "Best Efforts" obligations in its licensing agreement with the Blue Cross Association. Under these "Best Efforts" provisions, at least 80% of Anthem's revenue within the Anthem states must come from Blue-branded products, as must at least 66.67% of its revenue nationwide. Failure to comply could result in termination of Anthem's license, which would trigger a $2.9 billion fee to the Association.

Cigna, the third-largest seller of health insurance to large companies in the United States, serves approximately 13 million medical members nationwide and in more than 30 countries, in addition to offering other specialty products such as dental and vision insurance. Unlike Anthem, which has historically been able to leverage its size to negotiate steep discounts from providers, Cigna's provider discounts have generally not been as good, so Cigna has developed a different and innovative value proposition in order to compete for customers. Under its more collaborative arrangements with providers, and through the

integrated, customized wellness programs it offers its customers' employees, Cigna's focus is on reducing employees' utilization of expensive medical procedures and promoting wellness through behavioral supports and lifestyle changes. This offers customers a different means of lowering health care costs than the traditional model relying heavily on provider discounts.

On July 23, 2015, Anthem reached an agreement to merge with Cigna. The merger would leave Anthem as the surviving company, with a controlling share of the merged company's stock and a majority of seats on the merged company's board of directors. Within the Anthem states, Cigna customers would be permitted to remain with Cigna, at least for the time being, but Anthem and Cigna would otherwise no longer compete with one another in those states. Outside the Anthem states, Cigna's existing business would allow Anthem a bigger foothold to compete, subject to Anthem's "Best Efforts" obligations. The merger agreement extends until April 30, 2017.

On July 21, 2016, the United States, along with California, Colorado, Connecticut, Georgia, Iowa, Maine, Maryland, New Hampshire, New York, Tennessee, Virginia, and the District of Columbia, sued to enjoin the merger. Relying on Section 7 of the Clayton Act, 15 U.S.C. § 18, plaintiffs alleged that the merger would substantially lessen competition in the market for the sale of health insurance to national accounts in both the Anthem states and the United States as a whole, as well as in the market for the sale of health insurance to large group employers in 35 local markets. Plaintiffs also alleged that the merger would substantially lessen competition for the purchase of services from healthcare providers in the 35 local markets by giving the combined company anticompetitive buying power.

Following a six-week bench trial, the district court permanently enjoined the merger on the basis of its likely substantial anticompetitive effect in the market for the sale of health insurance to national accounts in the Anthem states, as well as in the market for the sale of health insurance to large group employers in Richmond, Virginia. *United States v. Anthem, Inc.*, No. CV 16-1493 (ABJ), 2017 WL 685563, at *68 (D.D.C. Feb. 21, 2017). It first defined the relevant national accounts market, accepting the government's proposed definition of "national account" as an employer purchasing health insurance for more than 5,000 employees across more than one state. It also found that the market properly included both fully insured and "administrative services only" ("ASO") plans. Under a fully-insured plan, the employer pays for claims adjudication, access to the insurer's provider network (including whatever discounted rates the insurer has negotiated), and coverage of the employees' medical costs. Under an ASO plan, the employer pays for claims adjudication and network access, but the employer self-insures and thus takes on the risk of its employees' medical costs. Finally, the district court found that the relevant geographic market for national accounts was the fourteen Anthem states, because that is where Anthem and Cigna currently compete most prominently, given the geographical restrictions imposed on Anthem under its Blue Cross license.

With the national accounts market so defined, the district court then found a presumption of anticompetitive effect based on the combined company's market share. It determined that the merger would increase HHI by 537 to 3000, while the Guidelines threshold is an increase of 200 to 2500, resulting in a highly concentrated market. Guidelines § 10. It also noted that under any variation performed by plaintiffs' expert the resulting numbers were still well over the presumptive Guidelines limits: considering only national accounts where 5%

of employees reside in another state, HHI would increase 641 to 3124; considering only ASO customers with 5% out-of-state employees, HHI would increase 880 to 3675; and considering all ASO national accounts, HHI would increase 771 to 3663. Anthem objected that these calculations overstated Anthem's market share by including all Blue customers even if they were not Anthem's, but the district court found that this was appropriate. Anthem's own internal calculations include these customers, and a key part of Anthem's value proposition to customers is that they can access all non-Anthem Blue networks nationwide.

Next, the district court found that Anthem had provided sufficient evidence to rebut the government's prima facie case. It relied on evidence that Anthem's primary competitor for national accounts is United Healthcare, not Cigna; that national accounts tend to be sophisticated, well-informed customers and thus better able to thwart an attempted price increase; that new entrants to the market will constrain pricing; and that the combined company would have incentives to innovate in its collaborative care arrangements with healthcare providers.

Finally, the district court found that the merger's overall effect in the Anthem states would be anticompetitive by reducing the number of national health insurance carriers from four to three. It rejected Anthem's efficiencies defense, which posited the combined company would realize $2.4 billion in medical cost savings through its ability to (1) "rebrand" Cigna customers as Anthem in order for them to access Anthem's existing lower rates; (2) exercise an affiliate clause in some of its provider agreements to allow Cigna customers access to Anthem rates; and (3) renegotiate lower rates with providers. First, it found that the claimed savings were not merger-specific because they were based on the application of rates that either company was already able to attain, and thus presumably each

company could attain the other's superior rates on its own. It also found that for Cigna customers that would be rebranded to Anthem, any related savings would not be merger-specific because Cigna customers could simply purchase the Anthem product today. It rejected the notion that the merger was necessary to allow Anthem customers access to Cigna's popular product offerings because Anthem had failed to show that it could not develop and offer these products on its own. Second, the district court found that the claimed savings also failed because they were not sufficiently verifiable. It found that Anthem's plan to exercise the affiliate clause in its provider contracts was unlikely to work as Anthem suggested. That is, exercise of the affiliate clause would likely give rise to provider resistance because the providers were unlikely to accept lower rates and provide more services without getting anything in return. The district court also found, as a matter of fact, that attempts to achieve the claimed savings through renegotiation of provider contracts would run into similar problems. It found that any savings would take time to be realized, and that Anthem's expert failed to account for utilization, *i.e.*, the amount of medical services that would be consumed by a given customer. In sum, it found the claimed savings were aspirational inasmuch as every proffered strategy either floundered in the face of business reality or was achievable without the merger, or both. The district court also expressed doubt as to whether the type of efficiencies claimed by Anthem, which merely redistribute wealth from providers to Anthem and its customers rather than creating new value, are even cognizable under Section 7.

Additionally, with regard to the Richmond market for large group employers, the district court found a presumption of anticompetitive effect based on the fact that Anthem and Cigna were the city's first- and second-largest competitors, with a combined market share of between 64% and 78%. It found that

Anthem rebutted the presumption by challenging the government's calculations, pointing to additional competitors outside the Richmond area and claiming that Anthem customers in the Federal Employee Program skewed its Richmond market share. Overall, however, the district court credited the testimony of the government's expert that even accepting all of Anthem's claimed efficiencies, the merger would still have a net anticompetitive effect. Because Anthem had not shown that the remaining competition (or potential market entrants) could likely constrain a price increase by the combined company, it found that the merger should be enjoined on that additional basis as well.

### III.

Our review of the district court's decision whether to issue a permanent injunction under the Clayton Act is limited to determining whether there was an abuse of discretion. *United States v. Borden Co.*, 347 U.S. 514, 518 (1954); *see FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001) ("*Heinz*"). The district court's conclusions of law are reviewed *de novo*, and its findings of fact must be affirmed unless clearly erroneous. *Heinz*, 246 F.3d at 713. If a finding of fact rests on an erroneous legal premise, then the court "must examine the decision in light of the legal principles [it] believe[s] proper and sound." *Id.* (quoting *Ambach v. Bell*, 686 F.2d 974, 979 (D.C. Cir. 1982)).

### A.

It is undisputed that the government met its burden to demonstrate a highly concentrated post-merger market, which would be reduced from four to just three competing companies. Anthem also does not dispute the definition of the national accounts market, nor that such a market will be even more highly concentrated post-merger. Anthem's appeal instead hinges on the district court's treatment of its efficiencies

defense. The premise of its defense was explained by its expert, Mark Israel, Ph.D. According to Anthem, Dr. Israel quantified the medical cost savings that the combined company could achieve post-merger using a "best of best" methodology, based on the economic theory that the combined company, with its greater volume, would be able to obtain discount rates that are no worse than either of the companies could achieve separately. Using claims data from Anthem and Cigna, he calculated that the merger would generate $2.4 billion in medical cost savings through improved discount rates, 98% of which he predicted would be passed through to customers, the large national employers with which Anthem and Cigna contract. Of the $2.4 billion in claimed savings, Dr. Israel projected that $1.517 billion would result from Cigna customers accessing Anthem's lower rates, while $874.6 million would result from Anthem customers accessing Cigna's lower rates; when viewed in terms of self-insured versus fully-insured customers, the former would purportedly see $1.772 billion of the claimed $2.4 billion, while the latter would see $619.8 million. Using merger simulation models, he balanced these projected savings against potential anticompetitive effects from the loss of the rivalry between the two companies and found the savings easily outweighed any potential harm. *See* Appellant Br. 5–6. But, as Anthem tends to ignore, the government offered its own evidence and experts to challenge these conclusions, as we discuss below.

Despite, however, widespread acceptance of the potential benefit of efficiencies as an economic matter, *see, e.g.*, Guidelines § 10, it is not at all clear that they offer a viable legal defense to illegality under Section 7. In *FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967), the Supreme Court enjoined a merger without any consideration of evidence that the combined company could purchase advertising at a lower rate. It held that "[p]ossible economies cannot be used as a defense to illegality. Congress was aware that some mergers which lessen

competition may also result in economies but it struck the balance in favor of protecting competition." *Id.* at 580. In his concurrence, Justice Harlan criticized this attempt to "brush the question aside," and he "accept[ed] the idea that economies could be used to defend a merger." *Id.* at 597, 603 (Harlan, J., concurring). No matter that Justice Harlan's view may be the more accepted today, the Supreme Court held otherwise, *id.* at 580, and no party points to any subsequent step back by the Court.

Nor does our dissenting colleague, despite his wishful assertion that *Procter & Gamble* can be disregarded by this court because it preceded the "modern approach" adopted in cases like *United States v. General Dynamics Corp.*, 415 U.S. 486 (1974), and *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977). *See* Dis. Op. 9–11, 14–15. The Supreme Court made no mention of *Procter & Gamble* in *General Dynamics*, 415 U.S. 486, and it cannot be read to have implicitly overruled the earlier decision because it did not involve efficiencies. *See id.* at 494–504; *see also* 4A PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 976c2, at 115 (2016) ("AREEDA & HOVENKAMP") (distinguishing between an efficiencies defense and *General Dynamics*' "competitive significance" defense). And whatever significance *Continental T. V.* may have in the area of vertical restraints on trade, 433 U.S. at 54–59, it did not do the yeoman's work that the dissent apparently ascribes to it here, for it did not involve efficiencies, mergers, or Section 7 of the Clayton Act. Even stranger is the dissent's suggestion that our decision in *Baker Hughes*, 908 F.2d at 986, blessed an efficiencies defense, *see* Dis. Op. 10–11, because *Baker Hughes* did not concern efficiencies and, like *Heinz*, 246 F.3d at 720, it could not overrule Supreme Court precedent. Nor has this court even hinted, as the dissent proclaims, that *General Dynamics* overruled *Procter & Gamble*'s efficiencies holding. *See Baker Hughes*, 908 F.2d at

988 (citing *Procter & Gamble* favorably); *Heinz*, 246 F.3d at 720 & n.18 (interpreting *Procter & Gamble*'s efficiencies holding). Put differently, our dissenting colleague applies the law as he wishes it were, not as it currently is. Even if "the Supreme Court has not decided a case assessing the lawfulness of a horizontal merger under Section 7 of the Clayton Act" since 1975, Dis. Op. 10, it still is not a lower court's role to ignore on-point precedent so as to adhere to what might someday become Supreme Court precedent.

Despite the clear holding of *Procter & Gamble*, 386 U.S. at 580, two circuit courts, and our own, have subsequently recognized the use of efficiencies evidence in rebutting a prima facie case. *Heinz*, 246 F.3d at 720 (citing, *inter alia*, *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045 (8th Cir. 1999); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206 (11th Cir. 1991)); *see also ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 571 (6th Cir. 2014). The Eighth Circuit, in holding that the government had produced insufficient evidence of a well-defined market, acknowledged that the district court may have properly rejected the efficiencies defense, while observing evidence of enhanced efficiencies should be considered in the context of the competitive effects of the merger. *Tenet Health Care Corp.*, 186 F.3d at 1053–55. The Eleventh Circuit similarly concluded that whether an acquisition would yield significant efficiencies in the relevant market is "an important consideration in predicting whether the acquisition would substantially lessen competition," *University Health, Inc.*, 938 F.2d at 1222, while noting both that "[i]t is unnecessary . . . to define the parameters of this defense now," and that "it may further the goals of antitrust law to limit the availability of an efficiency defense," *id*. at 1222 n.30. Other circuits have remained skeptical and simply assumed efficiencies can rebut a prima facie case, before finding that the merging parties had not clearly shown the merger would enhance rather than hinder competition. *See, e.g.*,

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 348 (3d Cir. 2016); *Saint Alphonsus Med. Ctr.–Nampa, Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 790 (9th Cir. 2015). These very recent decisions put to rest the dissent's notion that "no modern court" recognizes the continued viability of *Procter & Gamble*, *see Penn State Hershey Med. Ctr.*, 838 F.3d at 348; *Saint Alphonsus Med. Ctr.*, 778 F.3d at 789, while even a cursory reading of the court's opinion today puts to rest any suggestion that it "espouses the old . . . position that efficiencies might be reason to *condemn* a merger." Dis. Op. 15 (emphasis added) (quoting ERNEST GELLHORN ET AL., ANTITRUST LAW AND ECONOMICS IN A NUTSHELL 463 (5th ed. 2004)).

"Of course, once it is determined that a merger *would* substantially lessen competition, expected economies, however great, will not insulate the merger from a [S]ection 7 challenge." *Univ. Health*, 938 F.2d at 1222 n.29. Notably, Professors Areeda and Hovenkamp have observed that "Congress may not have wanted anything to do with an efficiencies defense asserted by a firm that was already large or low cost within the market and to whom the efficiencies would give an even greater advantage over rivals." AREEDA & HOVENKAMP, *supra*, ¶ 950f, at 42; *id*. ¶ 970c, at 31. As our subsequent analysis shows, this court, like our sister circuits, can simply assume the availability of an efficiencies defense to Section 7 illegality because Anthem fails to show that the district court clearly erred in rejecting Anthem's efficiencies defense.

This court was satisfied in *Heinz*, in view of the trend among lower courts and secondary authority, that the Supreme Court can be understood only to have rejected "possible" efficiencies, while efficiencies that are verifiable can be credited. 246 F.3d at 720 & n.18 (discussing 4 PHILLIP AREEDA & DONALD TURNER, ANTITRUST LAW ¶ 941b, at 154 (1980)). The issue in *Heinz* was whether under Section 13(b) of the

Federal Trade Commission Act, 15 U.S.C. § 53(b), preliminary injunctive relief would be in the public interest. 246 F.3d at 727. The court held that the district court "failed to make the kind of factual findings required to render that defense sufficiently concrete to rebut the government's prima facie showing," *id.* at 725, and, upon weighing the equities, remanded for entry of a preliminary injunction. *Id.* at 726–27. The court expressly stated however: "It is important to emphasize the posture of this case. We do not decide whether . . . the defendants' claimed efficiencies will carry the day." *Id.* at 727. These are not the issues in Anthem's appeal from the grant of a permanent injunction. *See LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc).

Consequently, the circuit precedent that binds us allowed that evidence of efficiencies could rebut a prima facie showing, *Heinz*, 246 F.3d at 720–22, which is not invariably the same as an ultimate defense to Section 7 illegality. *Cf. generally Saint Alphonsus Med. Ctr.*, 778 F.3d at 789–90 (and authorities cited therein). In this expedited appeal, prudence counsels that the court should leave for another day whether efficiencies can be an ultimate defense to Section 7 illegality. We will proceed on the assumption that efficiencies as presented by Anthem could be such a defense under a totality of the circumstances approach, *see Baker Hughes*, 908 F.2d at 984–85 (citing *General Dynamics*, 415 U.S. at 498), because Anthem has failed to show the district court clearly erred in rejecting Anthem's purported medical cost savings as an offsetting efficiency. Guidelines § 10; *cf. Heinz*, 246 F.3d at 720–22. Additionally, because the district court could permissibly conclude that the efficiencies defense failed, because the amount of cost saving that is both merger-specific and verifiable would be insufficient to offset the likely harm to competition, this court has no occasion to decide whether the type of redistributional savings claimed here are cognizable at all under Section 7. It bears noting, though, that

all of those other issues pose potentially substantial additional obstacles to this merger.

One further preliminary analytical point. Amici supporting Anthem invite the court to disregard the merger-specificity and verifiability requirements on the ground they place an asymmetric burden on merging parties that could doom beneficial mergers. *See* Br. for Antitrust Economists and Business Professors as Amicus Curiae in Support of Appellant and Reversal ("Amici Economists") at 5–7. Anthem itself has not adopted this argument. *See Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2776 (2014); *Eldred v. Reno*, 239 F.3d 372, 378 (D.C. Cir. 2001). We note, however, that Amici Economists misapprehend the nature of Anthem's claimed efficiencies as "direct price reductions," *id.* at 6–7, rather than as potential price reductions subject to a number of uncertainties. For customers to realize any price reduction, Anthem would first have to succeed in reducing providers' rates, and to that extent the purported reductions would not be a direct effect of the merger. By contrast, the merger would immediately give rise to upward pricing pressure by eliminating a competitor, *see, e.g.*, Tr. 960:12–18, and Anthem could unilaterally raise its prices in response. Further, Amici Economists ignore that fully-insured customers, and potentially self-insured customers depending on the terms of their contracts with Anthem, will not see any savings until Anthem takes a second action, renegotiating the customers' contracts to pass through the savings. This illustrates the reason for the verifiability requirement: Perhaps Anthem is certain to take those actions, and there will be no impediments to the savings' realization, but that showing is still necessary for a court to conclude that the merger's direct effect (upward pricing pressure) is likely to be offset by an indirect effect (potential downward pricing pressure). *See* Guidelines § 10. As for merger-specificity, Amici Economists point to no logical flaw

in the policy that consumers should not bear the loss of a competitor if the offsetting benefit could be achieved without a merger. *See Heinz*, 246 F.3d at 722.

**B.**

Any claimed efficiency must be shown to be merger-specific, meaning that it "cannot be achieved by either company alone because, if [it] can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor." *Heinz*, 246 F.3d at 722. The Guidelines frame the issue slightly differently: an efficiency is said to be merger-specific if it is "likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects." Guidelines § 10. Anthem faults the district court for considering whether the efficiencies "could" be achieved absent the merger, without regard to likelihood, Appellant Br. 24, even though in *Heinz*, 246 F.3d at 722, this court spoke repeatedly in terms of possibility ("can" or "could").

*Heinz*, 246 F.3d at 721–22, cited the Guidelines with approval in describing the standard for merger-specificity. Both the current and then-current Guidelines refer to "practical" alternatives to achieving the efficiency short of merger, alternatives that are more than "merely theoretical." Guidelines § 10 (2010); Guidelines § 4 (1997). Similarly, in *Heinz*, 246 F.3d at 722, the court considered whether it was practical for the company to obtain better baby food recipes by investing more money in product development, or whether that would cost more money than the merger itself. The real question is whether the alternatives to merger are practical and more than merely theoretical, *see id.*; Guidelines § 10. Even assuming there is any difference between the two standards, it would not affect the outcome here on this factual record. Viewed under either articulation, certain of Anthem's claimed efficiencies fall away.

The crux of Anthem's argument regarding merger-specificity is the theory that the combined company will allow Anthem to create a "new product" that is "unavailable on the market today": a product that features both "Cigna's customer-facing programs" and Anthem's "generally lower . . . rates." Appellant Br. 26. One way Anthem maintains the merger will result in this new product is through rebranding. According to Anthem, "rebranding means [the combined company] retain[s] the Cigna product but brand[s] it under the Anthem name with Anthem's negotiated provider rates." Appellant Br. 34. The record, however, refutes rather than substantiates Anthem's proposed rebranding approach. In fact, the record evidence Anthem cites for its rebranding plan is the testimony of Anthem Senior Vice President Dennis Matheis. But in that testimony, Matheis confirmed that, at least "[i]n the short term," rebranding would simply involve Anthem "offer[ing] Cigna customers Anthem products," in a manner that is "no different" than Anthem "selling new business in the market." Tr. 1599:20–25. In other words, when a Cigna customer rebrands, the immediate effect is that the customer gives up a Cigna contract and Cigna product in favor of an Anthem contract and Anthem product. Indeed, it is only "[o]ver the long haul," Matheis testified, that Anthem could actualize its "vision . . . [to] combine Cigna features . . . with Anthem features," Tr. 1606:17–21, and then rebranding might result in a former Cigna customer obtaining some semblance of the former Cigna product at the new Anthem rate. But rebranding in the immediate aftermath of the merger would involve a Cigna customer switching to the extant Anthem product, and that is not a merger-specific outcome; that is just more successful marketing of the existing Anthem product. And Anthem expressly "does not contend that . . . a customer simply switching from a Cigna product to an existing Anthem product[] results in merger-specific efficiencies." Appellant Reply Br. 21.

Instead, Anthem claims only that rebranding over the long haul, once it has successfully rolled out an improved, Cigna-like product, will result in a merger-specific benefit, and maintains that the district court clearly erred in finding Anthem could simply develop and offer an improved product on its own. Just as in *Heinz*, 246 F.3d at 722, the evidence offered by Anthem is woefully insufficient to show that it cannot develop better customer-facing programs. Anthem points to testimony from two witnesses that Anthem has failed to replicate Cigna's products, for reasons unknown. In particular, Anthem's President of Specialty Business Pam Kehaly testified that Cigna offers a "packaged integrated wellness approach where [Anthem offers] disparate pieces that employers kind of have to piece together on their own." Kehaly Depo. Tr. 87:12–15 (Apr. 28, 2016). According to Kehaly, Anthem has been trying to solve the problem for "probably a decade" but for whatever reason it just has "not been able to crack this nut." *Id.* at 88:3–13. She did not indicate how intensive the effort has been, how many hours were devoted to it, or how much money Anthem has allocated toward it. Anthem's Regional Vice President of Sales Brian Fetherston also testified that Cigna has "done a really good job of building wellness programs" and that Anthem has tried but failed to catch up. Fetherston Depo. Tr. 170:14–19 (May 6, 2016). The district court could properly find that failure likely results more from Anthem's own no-frills culture or flawed marketing strategies than from any inherent difficulties in pulling together an integrated wellness program. For instance, Fetherston testified that Cigna is "significantly better at marketing" its wellness program, while by contrast Anthem "just [was not] actively promoting" its own, and indeed, Anthem recently decided to "dial back some of [its] disease management programs," which Fetherston believed was a mistake. *Id.* 169:1–170:6, 323:1–23. To the extent Anthem has failed to devote the resources needed to improve its product, it is in no position to claim that consumers will benefit from it swallowing

up Cigna's superior product.

Put differently, rebranding does not create a merger-specific benefit in either the short- or long-term.  Perhaps Anthem could create some brief, interim benefit in the mid-term by integrating Cigna's product faster than it could develop a comparable product of its own.  Guidelines § 10 n.13 ("If a merger affects not whether but only when an efficiency would be achieved, only the timing advantage is a merger-specific efficiency.").  But Anthem made no sufficient factual showing in the district court on this point.  It has offered no evidence to show how long it would take, once the necessary resources were allocated, to develop an improved product.  Nor has it shown how long it would take to roll out a hybrid Anthem-Cigna product.  At oral argument, Anthem claimed that it could do so in six months, but at trial, Anthem's Senior Vice President Matheis allowed that it might not be able to do so within two-and-a-half years.

To the extent Anthem also maintains that none of Dr. Israel's claimed savings are dependent on rebranding, it ignores the reality of his economic model.  Without one of its mechanisms to get current Cigna customers access to Anthem rates, none of the $1.517 billion in claimed Cigna savings could be realized.  Although Dr. Israel may have been agnostic as to which mechanism is used to achieve those savings, he acknowledged that rebranding would achieve a portion of them: "If there was rebranding as a way to get the discounts . . . that would just be another way to get them faster."  Tr. 2108:9–11.  Given that rebranding is the linchpin of Anthem's post-merger strategy, because it is the only option that helps Anthem comply with its "Best Efforts" obligations, the inability to credit rebranding savings seriously undermines Anthem's efficiencies defense.

The district court further found that none of the medical cost savings are merger-specific because they are based on an application of rates that each of the companies has already achieved on its own. Anthem, quite reasonably, challenges this finding with regard to Cigna's rates on the ground that "there is no dispute that [Cigna] has generally secured less favorable provider rates than Anthem for years and has been unable to close that gap despite its best efforts." Appellant Br. 27. The record shows that, by its own account, Cigna has been unable to match Anthem's volume-based discounts and instead has had to compete on quality and innovation. Even the government's expert, Dr. David Dranove, agreed that a true Cigna product at Anthem rates would not be achievable absent the merger. That the district court clearly erred in finding that the application of Anthem rates to customers that choose to remain with Cigna is not merger-specific, however, is immaterial to the district court's ultimate conclusion that the merger would be unlawful because these claimed efficiencies are not sufficiently verifiable.

## C.

Under the Guidelines, projected efficiencies will not be credited "if they are vague, speculative, or otherwise cannot be verified by reasonable means." Guidelines § 10. Anthem maintains that the district court clearly erred because the $2.4 billion in projected post-merger savings was verified by two independent sources (Dr. Israel and an integration planning team from McKinsey & Company, which had access to each company's internal files). In Anthem's view, the district court also erred as a matter of law by imposing a "virtually insurmountable burden" of persuasion, Appellant Br. 38, when all that is required is to show "*probabilities*, not certainties," *Baker Hughes*, 908 F.2d at 984.

As discussed, Anthem plans to achieve the claimed savings through a combination of three mechanisms: rebranding,

renegotiating provider contracts, and exercising Anthem's affiliate clause. The district court found that practical business realities would undermine the execution of that plan, making achievement of the savings speculative, and therefore unverifiable. With regard to the affiliate clause, the district court focused on evidence of the potential for provider discontent if the lower Anthem rates are forced on providers that must expend extra effort and resources to deliver the Cigna product, without any corresponding increase in value for providers. This evidence included testimony by both Anthem and Cigna witnesses as well as documents from Anthem and Cigna that acknowledged the likely "abrasi[on]." *E.g.*, Pls.' Ex. 89. The record indicates that physician contracts can be terminated by either party with only 90 days' notice, so the affiliate clause would accomplish little if the contract is terminated or renegotiated soon after the clause is exercised. Hospital contracts tend to involve three-year commitments, so the affiliate clause may bind them to offer lower rates for a longer period. Still, when those hospital contracts expire, large delivery systems with greater leverage "could push back hard" in renegotiation. Pls.' Ex. 717. In either event, it is probable, as Cigna CEO David Cordani testified, that some providers will eventually "react [by] renegotiating . . . and putting upward pressure on rates, which has been a market force to date." Tr. 443:17–23. That "very few" Anthem providers have preemptively sought to renegotiate proves little, *see* Tr. 1686:15–25, because the feared abrasion would not occur until Anthem invokes the affiliate clause, assuming it ever does so.

This raises another practical difficulty with the affiliate clause: although it is theoretically useful to Anthem, in reality it is unlikely to be widely exercised because it works counter to Anthem's contractual obligations. Under the "Best Efforts" clause in Anthem's licensing agreement with the Blue Cross Blue Shield Association, 80% of Anthem's revenue within the

Anthem states must be Blue-branded, as must 66.67% of its revenue nationwide. The merger would immediately throw Anthem out of compliance and so Anthem intends to rebrand a "lion's share" of current Cigna customers in order to count that revenue as Blue-branded. Tr. 1600:17–21 (Anthem Sr. VP Matheis). By contrast, widespread exercise of the affiliate clause would remove any incentive for Cigna customers to convert to Anthem because those customers would then be receiving the Cigna product at Anthem prices, Dr. Israel's much-touted "best of both worlds" scenario. Anthem fails to address this reality when it maintains that 80% of the savings to Cigna customers could be achieved rapidly using the affiliate clause. *See* Appellant Br. 40. Because doing so would work contrary to Anthem's own contractual obligations, its witnesses conceded that it will instead rely heavily on rebranding, which, as discussed, gives rise to no merger-specific benefits.

As for renegotiation, the short answer is that *if* Anthem cannot persuade providers to extend lower rates to Cigna under its affiliate clauses — where it has apparent contractual recourse to do so — then it is speculative that Anthem could get them to agree to do the same thing through negotiations absent compulsion. Anthem assumes, as did Dr. Israel's model, that in all instances renegotiation would result in providers accepting the lower Anthem rates. That assumption appears questionable in the case of a provider that has just terminated a contract because Anthem mandated, through an affiliate clause, the acceptance of *those very rates*. Instead, Cigna's CEO Cordani predicted such renegotiation would put upward pressure on the Anthem rate, and to the extent Anthem were to adopt a take-it-or-leave-it approach, the provider could simply choose to walk away. *See* Br. for Amici Am. Med. Ass'n. & Med. Soc'y of D.C. ("AMA Br.") 11–12. This is especially true for large hospital networks with significant bargaining power.

To the extent that some medical savings would be achieved for Cigna customers at the bargaining table due to the combined company's volume, the district court expressed concern over how long such savings would take to be realized. Anthem's CEO Swedish testified that capturing medical savings requires a "long gestation period," in part because existing hospital contracts span three to five years and would not be subject to renegotiation "for a considerable period of time." Tr. 337:21–338:16. He also rejected the idea that Anthem would simply "drop[] the hammer" on providers by insisting on maximum discounts across-the-board because Anthem instead relies upon "customized relationship-driven contract[s]" that seek to optimize performance on a case-by-case basis, rather than focusing solely on discounts. Tr. 294:20–295:11. Anthem's expert agreed that renegotiations in the ordinary course of business will take place over time. The longer it takes for an efficiency to materialize, the more speculative it can be, *see* Guidelines § 10 & n.15, so the district court was on solid ground to give less weight to the claimed renegotiation savings.

In sum, although renegotiation will lead to a decrease in Cigna's rates, the assumption that it will in every instance lead to the Anthem rate is farfetched. *See Tenet Health Care Corp.*, 186 F.3d at 1054. Indeed, as the district court observed, "the Department of Justice is not the only party raising questions about Anthem's characterization of the outcome of the merger" because Cigna itself had "provided compelling testimony undermining the projections of future savings." *Anthem, Inc.*, 2017 WL 685563, at *4; *see also* Pls.' Ex. 722.

Whatever mechanism is employed to achieve the savings, the district court had "reason to question . . . whether the quality of the Cigna offering will in fact degrade" as a result of the merger, *Anthem*, 2017 WL 685563, at *61, which further undermines the purported efficiency claims. Guidelines § 10.

For those that choose to stay with Cigna post-merger — and thus would access lower rates through renegotiation or exercise of the affiliate clause — the abrasion problem arises because providers would be asked to continue offering the high-touch, collaborative Cigna service, with its added behavioral, wellness, and lifestyle programs, for less money. *See* AMA Br. 10–11. It was perfectly reasonable for the district court to find that some providers, even if they are willing to accept less money, will simply respond by offering customers less in the way of Cigna high-touch service. Furthermore, according to Cigna's CEO Cordani, the value of the Cigna offering will be diminished because Anthem's rebranding strategy will siphon business away from Cigna, leaving behind an atrophied Cigna customer base that is less attractive to providers. This will in turn diminish Cigna's capacity for further innovation with its collaborative model. And for Cigna customers that agree to migrate to Anthem (or are pushed into doing so because the company refuses to extend their expiring Cigna contracts), provider abrasion again rears its head, this time with providers being asked to offer Anthem customers better, and more resource-intensive, collaborative service for the same rates they have historically received. Anthem does not respond meaningfully to these concerns, simply labeling them "speculation." Appellant Reply Br. 10. In light of the numerous Anthem witnesses who acknowledged the abrasion problem, the district court did not err in finding it "dubious" that Anthem would be able to offer a true Cigna-like product, or that legacy Cigna would be able to maintain the quality of its own product. *Anthem*, 2017 WL 685563, at *59, *61.

The fact is, it is widely accepted that customers value the existing Cigna product, and that Cigna is a leading innovator in collaborative patient care. That threat to innovation is anticompetitive in its own right. *Cf. United States v. Cont'l Can Co.*, 378 U.S. 441, 465 (1964). And the problem is neither

answered by Anthem's evidence nor offset by its purported efficiency of offering a degraded Cigna product at a lower rate.

In addition to claimed savings to current Cigna customers, Dr. Israel also projected that $874.6 million in savings would be realized if Anthem's customers were able to access superior rates that Cigna has already negotiated. In focusing almost entirely on the other side of the ledger, Anthem offers little reason to think that the district court clearly erred in rejecting the claimed savings to existing Anthem customers. *See* Appellant Br. 41–42. To the extent Anthem argues on appeal that Anthem customers could access Cigna's superior rates through rebranding or exercise of an affiliate clause, the only witness it cites was actually discussing the affiliate clause in *Anthem's* contracts that would apply to *Cigna's* customers. And even assuming that Cigna's contracts contain an affiliate clause, Blue Cross Association rules would prohibit Anthem from exercising it. Further, rebranding Anthem customers to Cigna would only exacerbate Anthem's "Best Efforts" problem, which indicates why Anthem Senior VP Matheis testified that Anthem would rebrand a lion's share of Cigna customers to Anthem, not the other way around. Renegotiation would be the only viable option for realizing the projected savings to Anthem customers.

Moreover, Anthem has not explained why these projected savings would even exist. The record is clear that Anthem, unlike Cigna, has already achieved whatever economies of scale are available. According to *Anthem's* expert Dr. Robert Willig, in the 35 local markets identified in the government's complaint, the data did not show that Anthem's size correlated with its provider discounts. To the contrary, Dr. Willig testified that Anthem is "already past the threshold of having enough size to do what it needs to do in terms of offering volume to providers." Tr. 2231:9–12. Similarly, Anthem's CEO Joseph Swedish denied that Anthem would seek to negotiate even greater

volume-based discounts after the merger because post-merger Anthem would "certainly not [pay] less than what [it is] now paying as Anthem." Tr. 294:10–19. The evidence indicates that where Cigna has better discounts than Anthem, that is a result of factors other than volume, and the district court reasonably questioned whether those atypical discounts would remain available post-merger. In the absence of an additional volume-based discount, then, Anthem makes no effort to show how its current customers would see lower prices as a result of the merger, and certainly not to the tune of $874.6 million. Consequently, the district court did not clearly err in rejecting these alleged medical cost savings as unverifiable.

Next, the claimed medical cost savings only improve consumer welfare to the extent that they are actually passed through to consumers, rather than simply bolstering Anthem's profit margin. *See Univ. Health, Inc.*, 938 F.2d at 1223. After all, the merger potentially harms consumers by creating upward pricing pressure due to the loss of a competitor, and so only efficiencies that create an equivalent downward pricing pressure can be viewed as "sufficient to reverse the merger's potential to harm consumers . . . , e.g., by preventing price increases." Guidelines § 10; *see also* AREEDA & HOVENKAMP, *supra*, ¶ 971a, at 48 ("[A] sufficient amount of any efficiencies [must] be passed on that the post-merger price is no higher than the pre-merger price."). Dr. Israel testified that absent monopsony (*i.e.*, the exercise of market power to gain subcompetitive prices from providers), *any* cost savings will create downward pricing pressure, and while this is unobjectionable, the amount passed through to consumers indicates the strength of that pressure. *See* Br. of Professors as Amici Curiae in Support of Appellee and for Affirmance 7–8 ("Amici Professors"). The district court rightly cast doubt on Dr. Israel's estimated pass-through rate of 98%, which was unsupported by the evidence and treated self-insured and fully-insured customers identically.

Because ASO customers pay their employees' medical costs directly, any reduction in medical rates would result in savings that automatically pass through to the customer, absent some corresponding ASO price increase by Anthem. This would improve the quality of one aspect of the ASO product (*i.e.*, access to more deeply discounted network rates), and it could thus be procompetitive even if it did not immediately result in an ASO price decrease. *See* Guidelines § 10. Dr. Israel's analysis rested on the assumption that rather than raising ASO prices to capture the medical cost savings, Anthem would attempt to increase its market share by providing a much superior product at only a slightly higher price, thereby maximizing its profits through increased sales. The district court highlighted internal Anthem documents that discussed ways to keep those savings for itself, in particular where Anthem listed seven alternatives with 100% pass-through to ASO customers considered last. Contrary to Dr. Israel's assumption, then, Anthem apparently concluded that total pass-through was not the profit-maximizing, "optimal solution to capture the most value from [the] deal," and that it could actually lose business if customers initially saw savings that were not sustained over the long term. Pls.' Ex. 727. Amici Professors offer another reason why Anthem might have come to this conclusion: in highly concentrated markets, already-large insurers are less constrained by competition and thus tend to find it more profitable to capture medical savings and increase premiums. Amici Professors Br. 6–9; *see also* AREEDA & HOVENKAMP, *supra*, ¶ 971f, at 56 (in highly concentrated markets "there is less competition present to ensure that the benefit of efficiencies will flow to consumers"). That corroborates rather than remediates anticompetitive concerns.

As for fully insured customers, which comprise $619.8 million of the projected savings, the estimated pass-through is even less likely given that the savings would automatically inure to Anthem's benefit absent some corresponding price decrease to its customers. Dr. Israel recognized this dynamic at trial, and yet his model takes no account of it, applying a pass-through rate of 98% to both ASO and fully insured accounts. The record indicates that ASO customers, which pay medical costs directly to providers, are keenly attuned to fee transparency, but it is unclear fully-insured customers are afforded the same transparency. That is, if Anthem negotiates provider rates and pays providers directly, how would a customer be aware that Anthem had achieved medical savings, in order to be able to seek a pass-through in the form of a lower negotiated price? Further, when would fully-insured customers realize that renegotiated price, given that their existing contracts would not pass though any savings? *See* Tr. 2107:17–21 (Dr. Israel: ordinary-course renegotiation of employers' contracts "will take place over time"). Neither Anthem nor Dr. Israel answers (or addresses) these problems.

Finally, the district court did not clearly err when it criticized Anthem's failure to account in its projected savings for utilization, which is a signature aspect of the Cigna product. Dr. Israel's model was based on discounts that either company was able to achieve on its own multiplied by the total claims value, but as Anthem's CEO Swedish testified, "We don't live in a discount world any longer." Tr. 295:11. Cigna's CEO Cordani agreed: "If you're looking [only at] a discount calculation, if [Anthem] has a 2 percent lower discount for the emergency room service, you would assume that that's a savings," unless Cigna's wellness program helps the patient avoid that emergency room visit altogether. Tr. 443:10–16. Anthem maintains that Dr. Israel and the McKinsey & Co. team did account for utilization, because Dr. Israel testified that lower

utilization would result in a lower total claims value, a value that factored into both his and the McKinsey & Co. models. But this ignores that on cross-examination, Dr. Israel conceded that he did not control for the different risks and features of each company's population at a particular provider, which would be necessary to compare utilization, and so his model did not account for whether one company's utilization was better than the other's. And although Anthem nevertheless maintains that no evidence shows accounting for utilization would materially reduce the claimed savings, Dr. Dranove testified that any error or incorrect assumption would have a significant effect on the overall projected savings. *See* Tr. 2327:15–2329:11. Thus, the problem is less that the failure to account for utilization would necessarily reduce the projected savings, and more that it undermined the district court's confidence in the reliability and factual credibility of those savings calculations.

Both sets of projections suffered from additional, basic analytic flaws. For instance, Dr. Israel did not agree with the district court's national accounts market definition (employers with 5,000+ employees), so his savings projection was based on the broader market definition that he believed appropriate (large-group employers with either 50+ or 100+ employees). In other words, Dr. Israel's claimed $2.4 billion in savings is unmoored from the actual market at issue, and there is no indication of what portion is properly derived from the national accounts market. Similarly, the McKinsey & Co. analysts based some of their savings on a comparison of Cigna and Anthem rates where only one of the companies had negotiated a discount with that particular provider. This apples-to-oranges comparison of in-network versus out-of-network rates overstated the true disparity between the companies' existing discounts and thus necessarily inflated McKinsey & Co.'s projected savings. Even Dr. Israel acknowledged as much: his model only compared in-network rates because he concluded that "that's what the economics tells

you you need to do to get the answer right." Tr. 1855:2–22. This could help to explain why Dr. Israel's otherwise similar methodology resulted in a projection that was almost *a billion dollars* less than McKinsey & Co.'s.

The savings projected by McKinsey & Co. and Dr. Israel — uncritically relied on by the dissent, *e.g.*, Dis. Op. 4–8, 18 — were without a doubt enormous. The problem is, those projections fall to pieces in a stiff breeze. If merging companies could defeat a Clayton Act challenge merely by offering expert testimony of fantastical cost savings, Section 7 would be dead letter.

**D.**

Having considered the totality of circumstances, *see Baker Hughes*, 908 F.2d at 984, we hold that the district court reasonably determined Anthem failed to show the kind of "extraordinary efficiencies" that would be needed to constrain likely price increases in this highly concentrated market, and to mitigate the threatened loss of innovation. *Cf. Heinz*, 246 F.3d at 720. Given the record evidence, Anthem's objection that the district court "abdicated its responsibility" to balance the merger's likely benefits against its potential harm, Appellant Br. 46, rings hollow. Anthem seems to insist upon a dollar-for-dollar comparison after discounting whatever claimed efficiencies were properly rejected, in responding that "so long as at least one-third of the $2.4 billion of savings are likely to be achieved, the merger is procompetitive." Appellant Reply Br. 10. This would apparently require the court to calculate, for instance, a more realistic pass-through rate than the rejected 98% figure, or to estimate what percentage of the claimed $2.4 billion was attributable to customers with fewer than 5,000 employees and thus outside of the relevant market. Anthem has pointed to no relevant expert economic evidence on which to base such an imprecise calculation, and Anthem, not the district

court, has the burden of showing what portion of the claimed efficiencies will result from the merger itself. Even assuming it were possible on this record, *see University Health*, 938 F.2d at 1223, "[e]conomies cannot be premised solely on dollar figures, lest accounting controversies dominate § 7 proceedings," *Procter & Gamble*, 386 U.S. at 604 (Harlan, J., concurring). Because "the state of the science does not permit such refined showings," commentators have recommended simply giving the government the benefit of the doubt in a close case. *See* AREEDA & HOVENKAMP, *supra*, ¶ 971f, at 56. In any event, this is not a close case.

The dissent's critique of the court's opinion is not well founded. Its fundamental flaw is the failure to engage with the facts shown in the record as they pertain to merger-specificity and verifiability. Repeated references to unspecified evidence, *see, e.g.*, Dis. Op. 3, 12, 14, 17, on which the dissent bases sweeping conclusions, speak volumes. Rather than engage with the record, much less adhere to our standard for reviewing findings of fact by the district court, the dissent offers a series of bald conclusions and mischaracterizes the court's opinion. For instance, the dissent repeatedly claims that the court "does not fully accept the fact . . . that providers rates would actually be lower," Dis. Op. 17; *id.* at 15, when in fact the court accepts that rates would be lower for some existing Cigna (but not Anthem) customers post-merger. Those who rebrand with Anthem, however, will see no merger-specific savings, Op. 20–21, and the few that Anthem fails to rebrand will see far fewer savings than Anthem claims, due in large part to provider abrasion and big hospital systems that will stand their ground in renegotiation, Op. 24–27. The dissent baldly asserts that the efficiencies "are merger-specific by definition," Dis. Op. 6–7, without addressing the paucity of evidence that Anthem would be unable to develop a Cigna-like product without merging. So too, it baldly asserts that the savings were "sufficiently verified," while admitting

that it is not clear "just how much the employers would benefit from this merger." *Id.* at 7 (emphasis omitted). In other words, Anthem estimated an astronomical amount of savings, so even if that amount were wildly overstated, the dissent expects the court to trust that, as an unknown fraction of a large number, the result "would be large." *Id.*

To the extent the dissent notes any of the major factual problems with Anthem's depiction of the merger, it brushes them aside. It dismisses as "highly speculative" the provider abrasion problem that was *conceded by both Anthem and Cigna witnesses*, Dis. Op. 17, a problem that undermines Anthem's plans for realizing the savings through the affiliate clause and renegotiation. It characterizes record evidence that squarely contradicts Anthem's pass-through estimates — Anthem's own internal PowerPoint presentation — as "secret Anthem plans to dramatically raise [its] fees," *id.*, which is precisely what the evidence reflects. It attacks straw men like supposed reliance on "friction between the Anthem and Cigna CEOs," *id.*, when the court does not so rely, noting indeed the limited probative value of that evidence. Op. 4 n.1. It fails entirely to address Anthem's "Best Efforts" obligations, which make it likely that Anthem will rely predominantly on rebranding, a strategy that gives rise to no merger-specific benefit. Op. 24–25. The "Best Efforts" clause also creates a verifiability problem with regard to Anthem's other savings strategies, for instance undercutting Anthem's assertion that 80% of the savings to Cigna customers "could be achieved simply [and rapidly] by invoking the affiliate clause." Appellant Br. 40. Again, pulling at any one loose thread quickly unravels Anthem's narrative, but the dissent is simply unwilling to do so.

Ultimately, the dissent concludes that "[o]n this record, there is little basis to doubt that the cost savings for employers as a result of the merger would be large," without evincing any

real awareness of the record beyond the testimony of Anthem's expert and consultants. *See* Dis. Op. 7. To wit, the dissent suggests that Anthem's savings estimates went unrebutted at trial, Dis. Op. 6, when the record shows Dr. Dranove not only offered his own estimate of $100 million to $500 million but explained why those savings were unlikely to be realized, essentially for the reasons discussed in this opinion. *See, e.g.*, Tr. 3802:25–3803:11. Similarly, it recognizes no distinction between savings to existing Cigna customers (some of which the government concedes will materialize) and savings to existing Anthem customers (the existence of which even Anthem cannot explain in light of the testimony of both its CEO and expert, *see supra* Part III.C). Likewise, in concluding that the quality of the Cigna product (its wellness programs and the high-touch service that providers offer in support of the programs) will not degrade post-merger, the dissent does not go so far as to say there is no evidence to support the district court's contrary finding, *Anthem*, 2017 WL 685563, at *59, *61; rather, it asserts it does not consider this evidence "persuasive" or "convincing." Dis. Op. 18. Such *de novo* analysis throughout the dissent betrays no meaningful effort to engage with the district court's factual findings, which are subject only to review for clear error.

Furthermore, the dissent's assumption that the prices paid by consumers (regardless of the quality of the resulting product) are the sole focus of antitrust law is flawed. "The principal objective of antitrust policy is to maximize consumer welfare *by encouraging firms to behave competitively*." *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1363 (2013) (emphasis added) (quoting 1 P. AREEDA & H. HOVENKAMP, ANTITRUST LAW ¶ 100, at 4 (2006)). This single-minded focus on price ignores that in highly concentrated markets like this one, lower prices, if they occur at all, may be transitory. Owing to the lower level of competition in highly concentrated markets, when presented with lower supply input prices, companies have a

greater ability to retain for themselves the input savings rather than pass them on to consumers. The Clayton Act, as the Supreme Court "ha[s] observed many times, [is] a prophylactic measure, intended primarily to arrest apprehended consequences of intercorporate relationships before those relationships could work their evil." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 485 (1977) (internal quotation marks and citation omitted). The ability of a firm to obtain lower prices for inputs for its product (here, provider services) should, especially in light of the prophylactic nature of the Clayton Act, be viewed skeptically when high market concentrations may have the future effect of permitting capture of those savings. The dissent uncritically accepts Dr. Israel's rosy testimony to the effect that ASO savings "will be passed through to employers," Dis. Op. 15, but fails to address contrary Anthem documents and the historical tendencies of large companies in highly concentrated markets to capture savings. *E.g.*, AREEDA & HOVENKAMP, *supra*, ¶ 971f, at 56. The dissent also ignores the district court's numerous and not clearly erroneous findings, as previously discussed, that total or nearly total pass-through is unlikely. *See, e.g.*, *Anthem*, 2017 WL 685563, at *4, *62. Even if ASO savings would pass through in the short term, that does not "practically guarantee[]" that Anthem would not then raise its prices correspondingly. *But see* Dis. Op. 16.

Additionally, the dissent fails to recognize that lower prices may arise due to, or ultimately lead to, a decrease in product quality. Everyone would agree that rock-bottom provider rates seem beneficial to consumers, but when those rock-bottom prices lead to inferior medical services, any benefit to the consumers' wallets is diminished by the harm to their health. As the Guidelines state, if merging firms "would withdraw a product that a significant number of customers strongly prefer to those products that would remain available, this can constitute a harm to customers over and above any effects on the price or

quality of any given product." Guidelines § 6.4; *see also id.* § 10 ("[P]urported efficiency claims based on lower prices can be undermined if they rest on reductions in product quality or variety that customers value."). And a decrease in product quality is not merely speculative here — every dollar of medical cost savings realized by consumers will come at the expense of providers. It thus is quite plausible that paid less, the medical providers will provide less. These inconvenient facts do not jibe with the dissent's superficial, thirty-thousand-foot view of this case, and it is thus unsurprising that they are addressed in passing, if at all.

## IV.

Anthem fares no better in its challenge to the district court's independent and alternative determination that the merger should be enjoined on the basis of its anticompetitive effect in the Richmond, Virginia market for the sale of health insurance to "large group" employers with more than fifty employees. There, the government's prima facie case was even stronger than in the market for national accounts in the fourteen Anthem states. Depending on how market share was calculated (*i.e.*, including all Blue customers as Anthem or not, including fully insured customers or just ASO), the companies' combined market share ranged from 64% to 78%. Even under the calculation most favorable to Anthem (ASO-only, disregarding non-Anthem Blue customers), the merger would raise an overwhelming presumption of anticompetitive effect: HHI would rise 1511 to a post-merger total of 4350, where the Guidelines presumption threshold is an increase of 200 to a post-merger total of 2500. As the President of Anthem Virginia acknowledged, Anthem has the biggest share of the large group employer market across all of Virginia, and in Richmond, Cigna is its strongest competitor.

Anthem principally challenges the district court's reliance on a chart prepared by Dr. Dranove, the government's expert witness, showing the merger would have an anticompetitive effect in Richmond even crediting all of Dr. Israel's claimed efficiencies. The chart included an asterisk next to the Richmond entry signifying that "no amount of cost savings could offset employer harm due to decreased competition." Pls.' Ex. 760. On cross examination, Dr. Dranove was asked whether that meant even a savings of $10 billion or $20 billion would not offset the merger's harm, and he acknowledged that he could not recall the foundation for his statement. Given this inability to address that extreme hypothetical, Anthem maintains that the district court should not have relied on the statement or even on the chart as a whole.

The record shows that the district court did not rely on the "asterisk" statement and explained at trial that it would not do so because it was unnecessary to finding a substantial anticompetitive effect. As to the broader question whether Dr. Dranove's inability to explain the asterisk meant that the district court should have disregarded his chart (and related testimony) altogether, the district court did not abuse its discretion. *See Heller v. District of Columbia*, 801 F.3d 264, 272 (D.C. Cir. 2015). Leaving the asterisk statement aside, Anthem raises no real objection to the substance of the chart, only urging that Dr. Dranove's inability to explain the asterisk was so damaging that it called into doubt the reliability of his overall analysis. The district court, which heard extensive testimony from Dr. Dranove about the anticompetitive effects revealed by his economic models and relied on it heavily throughout its opinion, clearly concluded otherwise. The district court had "considerable leeway" to do so in determining that all other aspects of the chart and his testimony were reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *cf. Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).

Anthem's remaining challenges amount to an ineffectual attack on the district court's weighing of rebuttal evidence. It incorrectly states that the district court relied solely on Dr. Dranove's chart to find anticompetitive harm while ignoring evidence of "enormous" medical savings, Appellant Br. 53, when in fact Dr. Dranove testified that his chart credited 100% of Anthem's claimed savings and still found a net anticompetitive effect. Anthem posits that there would still be five or more competitive insurers in Richmond post-merger, but even assuming that is true (one of the two witnesses it cites identified only four, including the combined company), the mere existence of competitors may not be sufficient to constrain a larger Anthem that would control 64% to 78% of the market. *See* Guidelines § 5. Indeed, one of those competitors, Optima, was said to have struggled in the Richmond market, and Anthem shows no clear error in the district court's finding that Optima "does not appear able to compete on the same field as the merged company." *Anthem*, 2017 WL 685563, at *68. Nor does Anthem show clear error in the finding that other companies do not appear interested in entering the Richmond market, or that even if they did, their entry would be insufficient to constrain the combined company. The evidence cited by Anthem shows only that other companies may intend to enter Richmond (Innovation), or may have the ability to enter Richmond (Piedmont, VCU), or may have a marginal or embryonic presence in Richmond (Kaiser, Bon Secours), not that entry by these companies would offset the merger's anticompetitive potential.

Tellingly, our dissenting colleague offers a single mention of the district court's Richmond holding (in a parenthetical, no less), which itself is a sufficient basis for enjoining the merger. Any suggestion that the claimed savings would make the merger procompetitive in Richmond ignores the record evidence,

namely that even crediting all of the claimed savings, the merger of Richmond's two biggest large-group insurers would give the combined company such a vast market share that the overall effect of the merger would still be anticompetitive. As Dr. Dranove testified at trial, his analysis "still predicts a price increase" in the Richmond market "even [after] crediting every penny of th[e] efficiencies" estimated by Dr. Israel. That is, even ignoring Anthem's failure to show that the savings were merger-specific and sufficiently verifiable, *see supra* Part III.B–C, the proposed merger would cause an already highly concentrated market to become overwhelmingly so, with Anthem controlling as much as 78% of the market and two or three other companies fighting to maintain relevance. Although the dissent recognizes this appeal raises "fact-intensive question[s]," Dis. Op. 13, it has persistently failed to engage with the facts.

In conclusion, the district court did not clearly err in its factual findings that the merger would have anticompetitive effects in the Richmond market, and importantly, Anthem does not allege any error of law with respect to that determination. Thus, the district court did not abuse its discretion in enjoining the merger on the basis of the merger's anticompetitive effects in the Richmond market. And, as previously noted, this holding provides an independent basis for the injunction, even absent a finding of anticompetitive harm in the fourteen-state national accounts market.

Accordingly, we affirm the issuance of the permanent injunction on alternative and independent grounds.

MILLETT, *Circuit Judge*, concurring:  I join the opinion of the court in full, including its two separate and independent holdings that the proposed merger would substantially reduce competition in (i) the national-accounts market and (ii) the large-group-employer market in Richmond.  Indeed, as to the latter holding, all of Anthem's and the dissenting opinion's *Sturm und Drang* over efficiencies is beside the point because the district court held that, even accepting all of Anthem's claimed cost savings, the merger would still have substantial anticompetitive effects.  *United States v. Anthem*, Civil Action No. 16–1493 (ABJ), 2017 WL 685563, at *68 (D.D.C. Feb. 21, 2017).

With respect to the holding regarding the national-accounts market, I write separately only to underscore the foundational problems that pervade Anthem's and the dissenting opinion's insistence that any reduction in provider rates, standing alone, excuses an anticompetitive merger.

First, there is no dispute that, to have any legal relevance, a proffered efficiency cannot arise from anticompetitive effects.  Dissenting Op. 13 ("Cognizable efficiencies * * * do not arise from anticompetitive reductions in output or service.") (quoting DEPARTMENT OF JUSTICE & FEDERAL TRADE COMM'N, HORIZONTAL MERGER GUIDELINES § 10, at 30 (Aug. 19, 2010)).  Rather, the proffered efficiencies, even if verifiable, must at least neutralize if not outweigh the harm caused by the loss of competition and innovation. HORIZONTAL MERGER GUIDELINES § 10, at 30 ("cognizable efficiencies" must "reverse the merger's potential to harm customers in the relevant market"); *see also* 4A PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 270e, at 36–40 (4th ed. 2016).

That means that once a court has found a Section 7 violation, a generic statement that prices will go down proves nothing by itself.  Yet the dissenting opinion repeatedly hangs

its hat on the government's statement that the proposed merger will "lower" provider rates. *See* Dissenting Op. 4, 7, 15, 18–19. The government, however, never agreed with Anthem or the dissenting opinion's assigned dollar amounts. Nor did it ever concede that (i) the reduction would be sufficiently large to offset the merger's anticompetitive effects, (ii) the savings were obtainable only through merger, or (iii) the savings were verifiable.

In fact, all that the government stated was that any decrease in provider rates would come about through an exercise of unlawful market power. *See* J.A. 545. That would be an antitrust violation, not an efficiency. And that statement by the government hardly seems to merit "[l]inger[ing]" over, Dissenting Op. 4.

Second, what the dissenting opinion (at 15) labels as an "undeniable" predicate assumption—that any cost savings will necessarily be passed through to customers—not only is very much denied, Appellees' Br. 58, but actually flies in the face of the factual record. As the district court found, a number of damaging internal Anthem documents detailed the company's efforts and specific business options for actively *preventing* those savings from being passed through to customers and instead capturing the money for itself. *Compare* Dissenting Op. 5–6, 12, 15–16, *with*, *e.g.*, *Anthem*, 2017 WL 685563, at *62 ("Anthem's internal documents reflect that the company has been actively considering multiple scenarios for capturing any medical cost savings for itself[.]"); J.A. 2159 (Anthem presentation, entitled "Overview of potential ASO value capture models," states that "[p]ass[ing] all savings through to customers" is "not * * * optimal" because it fails to "capture most value from [the] deal"); Suppl. App'x 1863–1865, 1858,

1419, 463, 472 (sealed materials). It is right there in black and white.[1]

So the reason the opinion of the court does not "fully accept[]" the dissenting opinion's "key fact[]," Dissenting Op. 15, is because the district court found it to be untrue. And given the content of the internal Anthem documents, that factual determination was not clearly erroneous.[2]

Third, context matters. Lower rates cannot be trumpeted without first asking what those lower rates will buy. The second half of the government's statements about decreased provider rates was that they would lead to an inferior health care product, including reduced access to medical care and fewer doctors. Compl. ¶ 72; *see also* J.A. 545. The district court found as a matter of fact, and the opinion of the court rightly affirms, that customers would be paying less because they would be getting less in the form of a degraded Cigna product. Op. 27–28; *Anthem*, 2017 WL 685563, at *59 (crediting testimony that "imposing lower fee structures would unravel [Cigna's] collaborative relationships with providers"); *id.* at *61; *id.* at *63 ("[T]here is ample evidence in the record that the merger would harm consumers by reducing or weakening the Cigna value based offerings which aim to reduce medical costs by reducing utilization and by engaging with, rather than simply reducing the fees paid to, providers.").

---

[1] In addition, the dissenting opinion's rosy forecast (at 8) that Anthem's employer-customers would then automatically use those (unproven) savings to raise their employees' pay is cut out of whole cloth. Not even Anthem offered up that Panglossian prediction.

[2] Curiously, none of the large employers who, according to Anthem, stand to gain billions of dollars in savings have filed any brief in support of this merger.

Paying less to get less is not an efficiency; it is evidence of the anticompetitive consequences of reducing competition and eliminating an innovative competitor in a highly concentrated market.

Fourth, while the dissenting opinion repeatedly declares the record evidence "overwhelming[]" that the post-merger firm will deliver health care for less, *e.g.*, Dissenting Op. 8, it bears emphasizing that one half of this merger disagrees. "In this case, the Department of Justice is not the only party raising questions about Anthem's characterization of the outcome of the merger: one of the two merging parties"—Cigna—"is also actively warning against it." *Anthem*, 2017 WL 685563, at *4. Importantly, "Cigna officials provided compelling testimony undermining the projections of *future savings*" that Anthem proffered and the dissenting opinion embraces. *Id*. (emphasis added).

Finally, the assumption that the prices paid by Anthem's customers—whatever the quality of the resulting product—are the sole focus of antitrust law sits at the center of Anthem's and the dissenting opinion's contentions. But antitrust law is not so monocular. Rather, product variety, quality, innovation, and efficient market allocation—all increased through competition—are equally protected forms of consumer welfare. *See* HORIZONTAL MERGER GUIDELINES § 6.4, at 24.[3] Indeed, "withdraw[al of] a product that a significant number of customers strongly prefer to those products that would remain

---

[3] *See also Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("Consumer welfare is maximized when economic resources are allocated to their best use, and when consumers are assured competitive price and quality.") (citing, *inter alia*, *National Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross of Kansas City*, 452 U.S. 378, 387–388 & n.13 (1981)).

available * * * can constitute a harm to customers over and above any effects on the price or quality of any given product." *Id.* That is why, under antitrust law, anticompetitive conduct that lowers prices can be illegal. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) ("Under the Sherman Act a combination formed for the purpose and with the effect of raising, *depressing*, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.") (emphasis added).[4]

The dissenting opinion also founders on the mistaken belief that any exercise of increased bargaining power short of monopsony is procompetitive. But securing a product at a lower cost due to increased bargaining power is not a procompetitive efficiency when doing so "simply transfers income from supplier to purchaser without any resource savings." AREEDA & HOVENKAMP, *supra*, ¶ 975i, at 106. Plus, as Professors Areeda and Hovenkamp explain in language that speaks directly to Anthem's proposed merger: "Congress may not have wanted anything to do with an efficiencies defense asserted by a firm that was already large or low cost within the market and to whom the efficiencies would give an even greater advantage over rivals." *Id.* ¶ 970c, at 31.

Ultimately, the judicial task here is not to favor cost redistribution or any other economic agenda for its own sake. Congress has decided that any merger that "substantially * * * lessen[s] competition" is forbidden. 15

---

[4] *See also Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 988 (9th Cir. 2000) ("[T]he central purpose of the antitrust laws, state and federal, is to preserve competition. It is competition—not the collusive fixing of prices at levels either low or high—that these statutes recognize as vital to the public interest.").

U.S.C. § 18. Our task is to enforce that legislative judgment. To allow a merger that has already been proven to "substantially * * * lessen competition," *id.*, to proceed anyhow because of some unverifiable and non-merger-specific amount of price decreases accruing to one segment of the health care market would rewrite rather than enforce the Clayton Act.[5]

---

[5] Thus far the courts of appeals—including *United States v. Baker Hughes*, 908 F.2d 981 (D.C. Cir. 1990), and all of the cases on which the dissenting opinion relies—have only held that efficiencies may be used as part of an *evidentiary burden-shifting* scheme to *rebut* the government's *prima facie* showing of an anticompetitive merger. No court of appeals has gone as far as Anthem and held that a reduction in costs *standing alone* greenlights a substantially anticompetitive merger that would otherwise be barred by the Clayton Act. *See Federal Trade Comm'n v. University Health, Inc.*, 938 F.2d 1206, 1222 n.29 (11th Cir. 1991) ("Of course, once it is determined that a merger *would* substantially lessen competition, expected economies, however great, will not insulate the merger from a section 7 challenge."); AREEDA & HOVENKAMP, *supra*, ¶ 970f, at 42.

KAVANAUGH, *Circuit Judge*, dissenting: This important antitrust case involves a multi-billion dollar merger between two health insurers, Anthem and Cigna. As relevant to this case, those two insurers sell insurance services to large national businesses. There are four national insurers in that market: Anthem, Cigna, United, and Aetna. Anthem and United are the two major insurers in this market, whereas Cigna is a fairly small player. In the 14 States where Anthem and Cigna sell insurance services to large national businesses, Anthem has a 41% share of the market, and Cigna has a 6% share.

The U.S. Government sued under Section 7 of the Clayton Act to block the Anthem-Cigna merger. *See* 15 U.S.C. §§ 18, 25. The Government alleged that the merger would unlawfully lessen competition in the market for insurance services sold to large national businesses. The District Court agreed with the Government and enjoined the merger. The majority opinion affirms. I respectfully dissent.

At the outset, it is important to stress that this is an unusual horizontal merger case because of the nature of this particular slice of the insurance industry. To properly analyze this case, it is essential to understand precisely how these markets work.

There are three main players: (i) large employers, (ii) insurers, and (iii) healthcare providers, namely hospitals and doctors. Under the standard contracts that apply in this particular segment of the insurance industry, the employers do not pay premiums to the insurers. And the insurers do not pay the hospitals and doctors for healthcare services provided to the employers' employees. Instead, the employers pay insurers a fee for obtaining access to the insurers' provider network. Insurers in turn contract with healthcare providers – hospitals and doctors – to develop that provider network. In that upstream market, the insurers negotiate rates in advance with the hospitals and doctors.

As a result, when the employers' employees need health care, the employers pay those negotiated rates to the healthcare providers. Importantly, therefore, employers in this market are self-insured. They pay the insurers a fee simply to obtain access to the provider networks arranged by the insurers, as well as for certain administrative services performed by the insurers.

To summarize in simple terms: The employers pay the insurers a fee, and the insurers then act as the employers' purchasing agents for healthcare services. In that upstream market, the insurers negotiate in advance with hospitals and doctors over the rates that will be charged to employers for their employees' health care. When insurers negotiate lower provider rates, employers save money on health care.

Here, two insurers (Anthem and Cigna) want to merge. The majority opinion sees this as a classic horizontal merger case where the high concentration of this market and the merged insurer's high market share would mean increased prices for the employer-customers. But that understanding misses what I believe is the critical feature of this case. Here, these insurance companies act as purchasing agents *on behalf of their employer-customers* in the upstream market where the insurers negotiate provider rates for the employer-customers. When the insurers negotiate lower provider rates, those savings go directly to the employer-customers. The merged Anthem-Cigna would be a more powerful purchasing agent than Anthem and Cigna operating independently. The merged Anthem-Cigna would therefore be able to negotiate *lower* provider rates on behalf of its employer-customers. Those lower provider rates would mean cost savings that would be passed through directly to the employer-customers. To be sure, the merged company may charge its employer-customers an increased fee for obtaining those savings. But the record

overwhelmingly demonstrates that the cost savings to employers would far exceed any increased fees paid by employers.

In short, the record decisively demonstrates that this merger would be *beneficial* to the employer-customers who obtain insurance services from Anthem and Cigna. That is the core of my respectful disagreement with the majority opinion. (As I will explain in Part I-C below, if there is a problem with this merger, the problem lies in the merger's effects on hospitals and doctors in the upstream market, not in the merger's effects on employers in the downstream market.)

In Part I of this dissent, I will outline my approach to this case. In Part II, I will briefly summarize some of my concerns about the majority opinion and the concurrence.

I

A

The Government contends that this merger between Anthem and Cigna would cause undue market concentration in the market for the sale of insurance services to large employers, and would increase the merged company's market share to an anti-competitive level. The Government argues that, as a result, the merged Anthem-Cigna would be able to use its market power to raise the fees it charges to large employers for those insurance services. How much? The evidence in the record suggests that large employers would pay Anthem-Cigna increased fees of about $48 million annually by one estimate, up to $220 million annually by another estimate, and up to $930 million annually by yet another estimate.

But that is not the end of the antitrust analysis under the law governing horizontal mergers. The case law of the Supreme Court and this Court, as well as the Government's own Merger Guidelines, establish that we must consider the efficiencies and consumer benefits of a merger together with its anti-competitive effects. *See United States v. General Dynamics Corp.*, 415 U.S. 486, 498-500 (1974); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 720 (D.C. Cir. 2001); *United States v. Baker Hughes Inc.*, 908 F.2d 981, 990-91 (D.C. Cir. 1990); U.S. Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* § 10, at 29-31 (2010).

Here, as I will explain, the analysis of the overall effects of this merger shows that the merger would not substantially lessen competition in the market for the sale of insurance services to large employers. The record demonstrates that those large employers would *save* an amount ranging from $1.7 to $3.3 billion annually due to reduced rates charged by healthcare providers. For large employers, therefore, the savings from the merger would far exceed the increased fees they would pay to Anthem-Cigna as a result of the merger.

To begin with, the record evidence overwhelmingly demonstrates that the merged Anthem-Cigna, with its additional market strength and negotiating power in the upstream market, would be able to negotiate lower provider rates from hospitals and doctors for healthcare services. *Indeed, the Government itself agrees that this merger would allow Anthem-Cigna to obtain lower provider rates.* Linger on that point for a moment: The Government concedes that Anthem-Cigna would be able to negotiate lower provider rates that employers would pay for their employees' health care. On top of that, in light of the "affiliate clause" in many of Anthem's existing contracts, the merger would allow at least some of the businesses that currently purchase insurance

services from Cigna to obtain lower rates that Anthem has previously negotiated with providers.

How much would provider rates be reduced? Anthem-Cigna's integration planning team, working in consultation with McKinsey, an independent consulting firm, calculated $2.6 to $3.3 billion in projected annual savings for Anthem-Cigna's employer-customers as a result of the merger. Anthem-Cigna's expert, Dr. Israel, worked independently of the integration team, but he came to a similar conclusion. He determined that the merger would yield $2.4 billion in annual medical cost savings.

The record evidence also overwhelmingly demonstrates that the medical cost savings from the lower provider rates negotiated by Anthem-Cigna would be largely if not entirely passed through to the large employers that contract with Anthem-Cigna. The savings are passed through to employers because, under the contractual arrangements that apply in that market, the employers pay healthcare providers for the healthcare services provided to employees. So if the price of healthcare services is lower, the employers would directly benefit because the employers would then pay those lower prices.

The Government critiques those estimates in part by noting that the estimates include cost savings that will accrue to the fully insured employers. It is true that a slice of this large employer market is fully insured, not self-insured. For those large employers, there would not necessarily be automatic pass-through. Even taking the fully insured employers out of the equation, however, the annual savings to self-insured employers would still be at least $1.7 billion annually.

By contrast, the Government's expert, Dr. Dranove, never did a merger simulation that calculated the amount of the savings that would result from the lower provider rates and be passed through to employers. Even though the Government admitted that the merger would lead to a reduction in provider reimbursement rates, Dr. Dranove built an assumption into all of his models that there would be *zero* medical cost savings. *See* Trial Tr. 1159, 1867. So we are left with Anthem-Cigna's evidence showing $1.7 to $3.3 billion annually in passed-through savings for employers.[1]

Under the law, those efficiencies and consumer benefits identified by Anthem-Cigna must be both merger-specific and verified. *See* U.S. Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* § 10, at 30. Both requirements are satisfied here.

The efficiencies and consumer benefits in this case are merger-specific by definition. As even the Government

---

[1] To be sure, if a price decrease were accompanied by a substantial reduction in quality, that fact would raise a separate concern about this merger. But here, the record does not contain sufficient evidence, beyond some speculation and guesswork by the Government, that the merger would cause an actual decrease in the quality of medical service provided to employers by hospitals and doctors, or in the quality of customer service provided to employers by insurers.

Relatedly, the Government suggests that the current Cigna employer-customers, once switched over to Anthem after the merger, would utilize healthcare services more often. The Government argues that the higher utilization would cancel out some of the cost savings that the employer-customers would otherwise achieve. That suggestion is likewise highly speculative and does not square with the record, which shows that current Anthem employer-customers have *lower* utilization rates than the current Cigna employer-customers. *See* J.A. 480.

admits, Anthem-Cigna's enhanced bargaining power would come from the merger. And that enhanced bargaining power is a large part of what would enable Anthem-Cigna to negotiate the lower provider rates that in turn would lead to cost savings for employers. So, too, Anthem's ability to rely on its existing contracts to offer lower rates to Cigna customers is a direct result of the merger. There is little if any evidence to support the made-up notion that Anthem and Cigna could obtain lower provider rates even absent the merger. The claimed savings are merger-specific.

Moreover, the efficiencies and benefits were sufficiently verified (i) by Anthem-Cigna's expert witness Dr. Israel, (ii) by the merger integration planning team, working with McKinsey, the independent consulting firm, and (iii) by various healthcare providers who testified at trial. To be verified, the efficiencies and consumer benefits must be "more than mere speculation and promises about post-merger behavior." *Heinz*, 246 F.3d at 721. But they need not be certain. They merely must be probable. *See Baker Hughes*, 908 F.2d at 984 ("Section 7 involves *probabilities*, not certainties or possibilities."). Here, that bar is cleared because there is no doubt that the merger would reduce provider rates (as the Government concedes) and no doubt that the savings from those lower provider rates would be largely passed through to employers (as the contracts and basic structure of this self-insured market require). To be sure, one can debate just *how much* the employers would benefit from this merger. But Anthem-Cigna's expert and integration planning team calculated savings of $1.7 to $3.3 billion annually. On this record, there is little basis to doubt that the cost savings for employers as a result of the merger would be large – and far larger than the increased fees charged by insurers to employers as a result of the merger.

In short, the record overwhelmingly establishes that the merger would generate significant medical cost savings for employers in all of the geographic markets at issue here – overall, approximately $1.7 to $3.3 *billion* annually – and employers would therefore spend significantly less on healthcare costs. (As noted, the increased fees for employers, on the other hand, would amount to $48 to $930 *million*.) And because the employers would spend less on health care for employees, they would have more to spend on employees' salaries, thereby benefitting their employees. Some of the ultimate beneficiaries of this merger would be the rank-and-file workers who are employed by the businesses that obtain insurance services from Anthem and Cigna.

I of course recognize that the District Court's factual findings are reviewed only for clear error. But we are not a rubber stamp. And here, the record convincingly demonstrates that this merger would significantly reduce healthcare costs for the large employers that purchase insurance services from Anthem and Cigna. That is true across the 14 states in which Anthem and Cigna both operate, including Virginia (and the Richmond market). The District Court clearly erred, therefore, in concluding that the merger would substantially lessen competition in the market in which insurance services are sold to large employers.

B

In a separate discussion, however, the District Court also relied on 1960s Supreme Court cases and suggested that antitrust law may not allow consideration of the efficiencies and consumer benefits in the first place. If that were true, this would be an easy case for the Government given the

concentration of the market and the market share of the merged company.  But that description of the law is not correct.

In landmark decisions in the 1970s – including *United States v. General Dynamics Corp.*, 415 U.S. 486 (1974), and *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977) – the Supreme Court indicated that modern antitrust analysis focuses on the effects on the consumers of the product or service, not the effects on competitors.  In the horizontal merger context, the Supreme Court in the 1970s therefore shifted away from the strict anti-merger approach that the Court had employed in the 1960s in cases such as *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), and *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963).

As this Court has previously noted, in "the mid-1960s, the Supreme Court construed section 7 to prohibit virtually any horizontal merger or acquisition," but the Supreme Court subsequently "cut" those precedents "back sharply," beginning with its 1974 decision in *General Dynamics*.  *Baker Hughes*, 908 F.2d at 989-90.  In *General Dynamics*, the Supreme Court made clear that the merger analysis must take account not just of market concentration and market shares, but also of the "structure, history and probable future" of the market.  415 U.S. at 498 (quoting *Brown Shoe*, 370 U.S. at 322 n.38); *see also* E. THOMAS SULLIVAN & JEFFREY L. HARRISON, UNDERSTANDING ANTITRUST AND ITS ECONOMIC IMPLICATIONS 369 (6th ed. 2014) ("*General Dynamics* signaled a major shift in § 7 interpretation."); Note, *Horizontal Mergers After* United States v. General Dynamics Corp., 92 HARV. L. REV. 491, 499, 502 (1978) (The *General Dynamics* case "signaled a new judicial approach to section 7 cases. . . .  By endorsing an inquiry into such factors – the structure, history and probable future of the relevant market – *General Dynamics* brought antitrust analysis back into line with current economic thought.") (internal

quotation marks omitted); *cf.* ROBERT H. BORK, THE ANTITRUST PARADOX 210 (1978) ("It would be overhasty to say that the *Brown Shoe* opinion is the worst antitrust essay ever written. . . . Still, all things considered, *Brown Shoe* has considerable claim to the title.").

Applying that broader analysis, the *General Dynamics* Court rejected the Government's assertion in that case that a proposed merger between two leading coal producers would violate Section 7 of the Clayton Act. In subsequent cases, the Supreme Court has adhered to *General Dynamics*. *See, e.g.*, *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 631 (1974); *United States v. Citizens & Southern National Bank*, 422 U.S. 86, 120 (1975). Notably, since 1975, the Supreme Court has not decided a case assessing the lawfulness of a horizontal merger under Section 7 of the Clayton Act. So *General Dynamics* remains the last relevant word from the Supreme Court.

This Court has already concluded that we are bound by *General Dynamics*, not by the earlier 1960s Supreme Court cases. In *Baker Hughes*, we explained that "*General Dynamics* began a line of decisions differing markedly in emphasis from the Court's antitrust cases of the 1960s. Instead of accepting a firm's market share as virtually conclusive proof of its market power, the Court carefully analyzed defendants' rebuttal evidence." *Baker Hughes*, 908 F.2d at 990.[2] In *Baker Hughes*, we thus cited *General Dynamics* for the proposition that the Section 7 analysis is "comprehensive" and focuses on a "variety of factors," including "efficiencies." *Id*. at 984, 986. As *Baker Hughes* recognized, and as this Court reaffirmed in its later decision in *Heinz*, modern merger analysis must

---

[2] *Baker Hughes* was authored by Judge Clarence Thomas and joined by Judge Ruth Bader Ginsburg and Judge David Sentelle.

consider the efficiencies and consumer benefits of the merger. *See Baker Hughes*, 908 F.2d at 984-86; *Heinz*, 246 F.3d at 720 ("[E]fficiencies can enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, or new products.") (internal quotation marks omitted). Importantly, even the Government's own Merger Guidelines now recognize that the merger analysis must consider the efficiencies and consumer benefits of the merger. *See* U.S. Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* § 10, at 29-31; *see also Baker Hughes*, 908 F.2d at 985-86 ("It is not surprising" that "the Department of Justice's own Merger Guidelines contain a detailed discussion of non-entry factors that can overcome a presumption of illegality established by market share statistics." Those "factors include . . . efficiencies.").

We are bound by the modern approach taken by the Supreme Court and by this Court. *See generally* BRYAN A. GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT 31 (2016) ("[W]hen the Supreme Court overturns the standard that it had previously used to resolve a particular class of cases," federal courts "must apply the new standard and reach the result dictated under that new standard." The "results reached under the old standard" are no longer "binding precedent."). Under the modern approach reflected in cases such as *General Dynamics*, *Baker Hughes*, and *Heinz*, the fact that a merger such as this one would produce heightened market concentration and increased market shares (and thereby potentially harm other insurers that are competitors of Anthem and Cigna) is not the end of the legal analysis. Under current antitrust law, we must take account of the efficiencies and consumer benefits that would result from this merger. Any suggestion to the contrary is not the law.

12

C

That said, on my view of the case, the Government could still ultimately block this merger based on the merger's effects on hospitals and doctors in the *upstream* provider market. At trial, the Government asserted an alternative ground for blocking the merger: The Government claimed that the merger between Anthem and Cigna would give Anthem-Cigna monopsony power in the upstream market where Anthem-Cigna negotiates provider rates with hospitals and doctors. The District Court did not decide that separate claim. I would remand for the District Court to decide it in the first instance.

Monopsony power describes a scenario in which Anthem-Cigna would be able to wield its enhanced negotiating power to unlawfully push healthcare providers to accept rates that are below competitive levels. That may be an antitrust problem in and of itself. Moreover, the exercise of monopsony power to temporarily reduce consumer prices does not qualify as an efficiency that can justify an otherwise anti-competitive merger. The consumer welfare implications (and consequently, the antitrust law implications) of monopsony power and ordinary bargaining power are very different. Although both monopsony and bargaining power result in lower input prices, ordinary bargaining power usually results in lower prices for consumers, whereas monopsony power usually does not, at least over the long term. *See* 4A PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 980, at 108 (3d ed. 2009); HERBERT HOVENKAMP, FEDERAL ANTITRUST POLICY § 1.2b, at 15 (4th ed. 2011). Therefore, the exercise of *bargaining power* by Anthem-Cigna is *pro-competitive* because it usually results in lower prices for Anthem-Cigna's employer-customers. By contrast, the exercise of *monopsony power* by Anthem-Cigna may be *anti-competitive* because it may result in higher prices for Anthem-

Cigna's employer-customers. *Cf.* U.S. Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* § 10, at 30 ("Cognizable efficiencies . . . do not arise from anticompetitive reductions in output or service.").

Notably, even Anthem-Cigna concedes that the merger would be unlawful if the merger would give Anthem-Cigna monopsony power in the upstream market. *See* Tr. of Oral Arg. at 85 (Defense Counsel: "If it was an exercise of market power on the buy-side, monopsony, we are not claiming that it's a cognizable efficiency. We're accepting the rule in the merger guidelines that if it really is the exercise of market power, which means a constraint in output, bringing the price away from the competitive level, yes, we're not claiming that that's a cognizable efficiency.").

To be clear, if Anthem-Cigna would obtain lower provider rates merely because of its enhanced ability to negotiate lower prices with providers, that alone would not necessarily be an antitrust problem. But if Anthem-Cigna would obtain provider rates that are below competitive levels because of its exercise of unlawful monopsony power against providers, that could be a problem, and perhaps a fatal one for this merger. In other words, if the lower provider rates from this merger turn out to be the fruit of a poisonous tree – namely, the fruit of Anthem-Cigna's exercise of unlawful monopsony power against hospitals and doctors in the upstream market – then the merger may be unlawful. *See* U.S. Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* § 10, at 30.

As a result, the legality of the merger should turn on the answer to the following fact-intensive question: Would Anthem-Cigna obtain lower provider rates from hospitals and doctors because of its exercise of unlawful monopsony power in the upstream market where it negotiates rates with healthcare

providers? Given the way it resolved the case, the District Court never reached that critical question. Therefore, I would remand for the District Court to expeditiously decide that question in the first instance.

II

The majority opinion portrays this as an easy case for blocking the merger. If the law and the facts were as described by the majority opinion, I would agree with it. But in my view, the law and the facts are not as described by the majority opinion. Indeed, the majority opinion outflanks even the Government's position on the law and the facts.

*First*, the Government accepts as a given that a defendant in a Section 7 case may rely on a merger's efficiencies to show that a merger would not be anti-competitive despite the increased market concentration and market shares that would result from the merger. But the majority opinion – echoing the District Court – does not accept that legal principle as a given. On the contrary, the majority opinion casts doubt on this Court's opinions in *Baker Hughes* and *Heinz*, and on whether Section 7 analysis allows a court to take account of a merger's efficiencies as a defense in a merger case. The majority opinion says that the Supreme Court's 1967 decision in *FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967), is the essential precedent on this question. For the majority opinion, we are apparently stuck in 1967. The antitrust clock has stopped. No *General Dynamics*. No *Continental T. V. v. GTE Sylvania*. No *Baker Hughes*. No *Heinz*. No updated Merger Guidelines.[3] To reiterate, not even the Government makes that far-reaching argument. For good reason. As one hornbook aptly puts it, the

---

[3] The concurrence goes so far as to say that even if "prices will go down," that "proves nothing by itself." Concurring Op. at 1.

"truly important point is that no modern observer, and no modern court, espouses the old *FTC v. Procter & Gamble Co.* (1967) position that efficiencies might be reason to condemn a merger."   ERNEST GELLHORN, WILLIAM E. KOVACIC & STEPHEN CALKINS, ANTITRUST LAW AND ECONOMICS IN A NUTSHELL 463 (5th ed. 2004); *see also Baker Hughes*, 908 F.2d at 985 ("Indeed, that a variety of factors other than ease of entry can rebut a prima facie case has become hornbook law. . . . [O]ther factors include industry structure, weakness of data underlying prima facie case, elasticity of industry demand, inter-industry cross-elasticities of demand and supply, product differentiation, *and efficiency*.") (emphasis added).

Fortunately, the majority opinion in the end does not actually *hold* that there is no efficiencies defense available in Section 7 cases.  The majority opinion merely suggests as much in dicta – perhaps portending a return to 1960s antitrust law in some future merger case.  For purposes of this case, however, the majority opinion simply says that even assuming such a defense exists under the law, the defense would not be satisfied here.  The majority opinion's lack of a square holding on the role of efficiencies in merger cases is some measure of good news because it means that future district courts and future panels of this Court still must follow *General Dynamics*, *Baker Hughes*, and *Heinz*, not the ahistorical drive-by dicta in today's majority opinion.

*Second*, on the facts, the majority opinion never fully accepts the two key facts in this case:  First, provider rates will be lower; and second, the savings from those lower rates will be passed through to employers.  The first fact is conceded by the Government, and the second fact is undeniable given the nature of this market and the contractual relationships between employers and insurers.

As mentioned above, the key difference between this horizontal merger and some horizontal mergers is that the increased savings obtained by the merged company in the upstream supply market in this case would be passed through *directly* to consumers. That one fact makes this merger unusual. In the ordinary case of a merger where the merged firm would have market power, it can be difficult for the merged firm to demonstrate that a substantial portion of the efficiencies resulting from the merger would actually be passed through to consumers instead of being retained by the merging companies. *See, e.g.*, *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1090 (D.D.C. 1997) ("Staples and Office Depot have a proven track record of achieving cost savings through efficiencies, and then passing those savings to customers in the form of lower prices. However, in this case the defendants have projected a pass through rate of two-thirds of the savings while the evidence shows that, historically, Staples has passed through only 15-17%."); *see also* U.S. Department of Justice & Federal Trade Commission, *Horizontal Merger Guidelines* § 10, at 31 ("The greater the potential adverse competitive effect of a merger, the greater must be the cognizable efficiencies, and the more they must be passed through to customers."). However, in this case, a high pass-through rate is practically guaranteed because, under the contractual arrangements that apply in the relevant market, the employers pay healthcare providers for the healthcare services provided to employees. So if the price of healthcare services is lower, the employers directly benefit because Anthem-Cigna's employer-customers pay those lower prices.

The only real factual question concerning the effects of the merger on large employers should be whether the savings to employers from lower provider rates would exceed the increased fees employers would pay to Anthem-Cigna for the insurance services. As I have explained, the record evidence

overwhelmingly indicates that the savings to employers from lower provider rates would greatly exceed the increased fees they would pay to Anthem-Cigna for the insurance services.

But the majority opinion does not conduct that key inquiry. That is because the majority opinion does not fully accept the fact, undisputed by the parties, that provider rates would actually be lower as a result of this merger. And the majority opinion likewise does not accept that any possible cost savings would actually be passed through. So for the majority opinion, there are no cognizable efficiencies to consider in the first place and no need to assess whether the cost savings for employers are greater than the increased fees paid by employers.

The majority opinion offers up a smorgasbord of reasons to think that provider rates would not be lower or would not really be passed through, ranging from provider "abrasion," to secret Anthem plans to dramatically raise the fees it charges employers, to Anthem's supposed inability to force or negotiate with providers to obtain Anthem rates for Cigna customers, to friction between the Anthem and Cigna CEOs. All of that seems at best highly speculative. The plural of anecdote is not data. Of course, lots of bad things *could* happen after the merger. But the courts have to assess what is *likely*. *See Baker Hughes*, 908 F.2d at 984 ("Section 7 involves *probabilities*, not certainties or possibilities."). The majority opinion seems to be accepting the worst-case possibility rather than determining what is likely. And the overwhelming evidence of what is likely is that provider rates would go down, that the savings would be passed through to employers, and that the savings to employers would greatly exceed any increase in fees paid by employers.

To the extent the majority opinion acknowledges even obliquely that prices possibly could go down after the merger,

the majority opinion retorts that quality will also go down after the merger. But quality of what? As noted earlier, there is no persuasive evidence that the quality of medical care provided by hospitals and doctors would decrease. Nor is there any convincing evidence that the quality of services provided to employers by insurers would meaningfully decrease. Not to mention, does any supposed decrease in quality really rise to the level of $1.7 to $3.3 billion annually? The record discloses no meaningful effort to quantify or calculate the supposed decrease in quality.

The majority opinion also says that Cigna provides programs that help reduce utilization and that those could be jettisoned after the merger. But there is no good reason to think that those programs would be jettisoned rather than adopted by the merged company. Moreover, this speculation does not account for the fact that Anthem already has lower utilization rates than Cigna. So is it not likely that Cigna customers would utilize health care *more* after the merger than they do now.

\* \* \*

The analysis of a merger's effects necessarily entails a predictive judgment. Courts are often ill-equipped to render those predictive judgments in cases of this sort. But here, we have a far clearer picture of what will unfold than we often do. We know that Anthem-Cigna would be able to negotiate lower provider rates; indeed, *even the Government admits as much*. And we know that those savings will be largely passed through to employers because that is the way the market and contracts are structured. After all, the whole point of the provider rates negotiated by insurers is to establish the prices that the *employers* will pay. If the prices are lower, the employers will pay less. And we know, furthermore, that any cost savings to

employers likely would greatly exceed any increase in fees paid by employers.

On this record, this horizontal merger therefore would not substantially lessen competition in the market for the sale of insurance services to large employers. The District Court clearly erred in concluding otherwise, and I disagree with the majority opinion's affirmance of the District Court's judgment.

The problem for this merger, if there is one, is in its effects in the upstream market – namely, in its effects on hospitals and doctors as a result of Anthem-Cigna's enhanced negotiating power. Therefore, my approach to this case would require District Court resolution of one remaining question: Would Anthem-Cigna obtain lower provider rates from hospitals and doctors because of its exercise of unlawful monopsony power in the upstream market where it negotiates rates with providers? If yes, then Anthem-Cigna concedes that the merger is unlawful and should be enjoined. If no, then the merger is lawful and should be able to go forward. I would vacate the District Court's judgment and remand for the District Court to expeditiously resolve that fact-intensive question in the first instance.

I respectfully dissent.